***********
The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Taylor, and the briefs and oral arguments before the Full Commission. The appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence of record, the Full Commission hereby reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties before the hearing before the Deputy Commissioner and in a Pre-Trial Agreement as:
 STIPULATIONS
1. The employee is Lavern Peters.
2. The employer is WestPoint Stevens, self-insured.
3. The administrator is Constitution State Service Co.
4. At all relevant times, defendant regularly employed three or more employees and was bound by the Workers' Compensation Act. The employer-employee relationship existed between employer and employee on September 25, 2000, the date of the alleged compensable injury.
5. A Form 22, Wage Chart, is stipulated to by the parties, and plaintiff's average weekly wage may be determined therefrom.
6. Plaintiff's medical records and rehabilitation reports are stipulated into evidence as Stipulated Exhibit 1 as authentic and admissible as business records, but not as to the accuracy of historical statements and any causation opinions expressed or implied therein.
7. The depositions of Lavern Peters and Annie Mae Peters are stipulated into evidence as Stipulated Exhibit 2 and 3, respectively.
8. Defendant initially paid compensation without prejudice to later deny the claim pursuant to I.C. Form 63 dated October 2, 2000. By Order filed December 14, 2000, Executive Secretary Tracey Weaver extended by 30 days the time within which payments without prejudice could continue before defendants accepted or denied the claim.
9. The parties stipulate that the issue to be heard is whether plaintiff's head injury and resulting disability arose out of and in the course of his employment.
 *********** EVIDENTIARY RULINGS
Plaintiff made a Motion to Strike the testimony of Dr. Saami Shaibani based upon the assertion that Dr. Shaibani testified in a criminal case and a judge ruled that Dr. Shaibani committed perjury. Plaintiff moved for the Commission to find that Dr. Shaibani committed perjury on that basis, and in the alternative, give his testimony no weight. Plaintiff's Motion is DENIED.
 ***********
Based upon all the competent evidence of record, and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 57 years old and had been employed with defendant for 20.5 years. He was employed as a roll-up attendant in defendant's Roanoke Rapids textile plant, where his job involved working on a machine that made sheets of finished cloth into rolls.
2. One of plaintiff's duties as a roll-up attendant was known as "doffing the cloth," which involved unraveling a seam on the sheet of finished cloth when the roll reached a certain size. Once he had separated the roll from the rest of the sheet, he would mark the roll with his initials and the measurement of the cloth, and then roll the roll onto a conveyor belt. Plaintiff would next begin a "starter roll" by taking the end of the sheet of cloth and rolling it onto a new roll by hand. The process is then begun again by depressing a pedal located on the platform next to the roll.
3. On September 25, 2000, plaintiff injured his head when he fell from the 8-inch raised platform on which he was working.
4. Plaintiff was found lying on his back next to the platform with his feet a few inches from the platform and his arms at his sides.
5. Plaintiff does not remember his fall. The last thing he remembers is returning from his 8 p.m. break and doffing a roll of cloth. His next memory after marking the finished roll of cloth was waking up at Pitt Memorial Hospital.
6. Plaintiff suffers from hypertension and first-degree heart block. Four days prior to his accident, Dr. Byrd diagnosed plaintiff with those conditions and ordered that he continue taking Ziac, which is a combination beta-blocker and diuretic that can cause dizziness and lead to syncope, or a transient loss of consciousness. Dr. Byrd also prescribed an antibiotic.
7. At the beginning of his shift on the day he fell, plaintiff approached his supervisor, Calvin Jeffers, and told him that he was feeling weak and may need to go home. During an investigation conducted by Al Joyner, the safety director at the plant in which plaintiff worked, it was revealed that plaintiff made a similar complaint to other co-workers.
8. After plaintiff's fall, he was taken to the emergency room at Halifax Regional Medical Center, where he was examined by Charles Williamson, M.D. Although plaintiff does not remember being in the emergency room, Dr. Williamson testified that plaintiff was responsive to questioning and said that he thought he might have passed out. The nurse's note from the emergency room reflects that plaintiff's initial complaint was dizziness and falling backward. Dr. Williamson's diagnosis of syncope was based on plaintiff's report.
9. Plaintiff's co-worker, Harrington Ferguson, was the only witness to plaintiff's fall. On the day after the accident, September 26, 2000, Mr. Ferguson had a conversation with Al Joyner about the accident. During that conversation, Mr. Ferguson told Mr. Joyner that he did not know why plaintiff fell. He told Mr. Joyner that he was standing next to plaintiff and thought he saw the started roll turn when plaintiff fell and that he thought plaintiff might have hit it as he fell to the floor.
10. On October 3, 2000, Mr. Ferguson gave a written statement in which he described the started roll as having turned a half-turn when plaintiff fell. Mr. Ferguson then stated that this caused him to believe that plaintiff's foot struck the pedal prior to the fall. When questioned about the inconsistency with his first statement, Mr. Ferguson responded that he had thought about it and changed his belief about what had happened.
11. On November 28, 2000, Mr. Ferguson again spoke with Mr. Joyner, at which time Mr. Joyner asked him whether there was any conversation between him and plaintiff when Mr. Ferguson returned to his workstation where plaintiff was standing on the night plaintiff fell. Mr. Ferguson replied that there had not been any conversation, and that when he walked up to plaintiff, plaintiff took a step back and fell.
12. Mr. Ferguson testified at the hearing that after plaintiff doffed the roll of cloth, he and plaintiff were talking on the platform, which measured approximately five feet by eight feet, when plaintiff stepped back and tripped over the pedal that operated the rollers. Mr. Ferguson stated that plaintiff then lost his footing, fell backwards, and tried to grab hold of something to prevent a fall. Mr. Ferguson testified further that plaintiff struck his head on the concrete floor and came to rest with his arms at his sides and his feet "a couple inches from the platform."
13. Although Mr. Ferguson admitted that he did not actually see plaintiff's foot hit the pedal, he testified that he could tell that plaintiff tripped over the pedal because he saw the started roll turn a quarter turn when plaintiff fell.
14. The Full Commission finds that any inconsistencies in Mr. Ferguson's account of plaintiff's fall are likely a result of his attempt to explain an otherwise unexplainable fall, and do not undermine the credibility of his testimony as a whole: that plaintiff lost his footing by some unknown means, fell backward, and tried to grab hold of something to prevent a fall.
15. Saami Shaibani, D.Phil., who specializes in injury mechanisms analysis, visited the plant where plaintiff's fall occurred and conducted tests using the actual platform and a man of similar size as plaintiff to determine how plaintiff's fall and resulting injury occurred. He also examined plaintiff's medical records and the pedal that plaintiff tripped over, by Mr. Ferguson's account.
16. First, Dr. Shaibani addressed whether plaintiff's fall could have triggered the pedal and the machine in the way that Mr. Ferguson testified that it did. Dr. Shaibani opined that, after having trained operators repeatedly activate the pedal under a variety of conditions and observing how the movement of the pedal related to the activation of the machine, the pedal had to depressed exactly one inch before the machine began to operate. Dr. Shaibani summarized his findings by stating that, in his opinion, he "could not see any way in which this foot-operated pedal could be activated inadvertently."
17. Also with respect to the pedal, Dr. Shaibani opined that Mr. Ferguson's account of the fall is physically impossible due to the way the machine operates. Dr. Shaibani reported to have determined that the minimum activation of the pedal caused the started roll to go around a minimum of two times. Thus, Dr. Shaibani opined that it would have been physically impossible for the roll to turn a quarter to a half turn, as Mr. Ferguson testified.
18. Dr. Shaibani also opined that the risk of injury from a fall onto a concrete floor is not increased by falling from a small height, such as the eight-inch platform from which plaintiff fell. Furthermore, he testified that there was nothing unusual about the floor onto which plaintiff fell that would have increased his chance of injury as compared to other concrete floors.
19. Upon reviewing Dr. Shaibani's testimony in this matter, the Full Commission finds that his opinions regarding plaintiff's fall were based on experiments in which his methodology appears to be flawed and unreliable. Thus, his analysis of the facts surrounding plaintiff's fall is ultimately speculation and conjecture. For these reasons, the Full Commission gives little weight to the testimony of Dr. Shaibani.
20. Mitchell Freedman, M.D., a neurologist who reviewed plaintiff's medical records, was of the opinion that the cause of plaintiff's fall was "more likely syncope than anything else." Dr. Freedman was also of the opinion that if the evidence shows that plaintiff collapsed, his opinion is that most likely, plaintiff had a syncopal spell. Based on plaintiff's diagnosis of first-degree heart block, the fact that he had been prescribed Ziac by Dr. Byrd, and that plaintiff had complained of weakness before his fall, Dr. Freedman testified that plaintiff's syncopal spell was likely cardiovascular in nature.
21. The Full Commission notes that there is no evidence in the record showing that plaintiff has ever been diagnosed as having syncopal spells. Dr. Freedman's opinion regarding the likelihood of plaintiff having a syncopal spell is based only upon his review of plaintiff's medical records. In his testimony, Dr. Freedman stated that the reason he believed plaintiff's fall was due to an idiopathic cause, such as a syncopal spell, was because he believed plaintiff was unconscious at the time of his fall. Dr. Freedman stated in his deposition:
 I think it's more likely that the reason [plaintiff] fell that was is it's more likely he was unconscious. And when people fall and that are conscious while they are falling, they do all matter I mean, you think about it if you are falling and you lose your balance . . . as you're falling and you're aware of what's going on, you do everything on the planet to protect your head, to protect your face. You don't just fall back and not do anything.
 So, if in fact the evidence suggests the evidence says that the way he fell was to fall backwards and not make any effort to right himself, he was unconscious as he was falling.
The Full Commission finds that the above opinions of Dr. Freedman are contrary to the evidence of record, which supports that plaintiff did attempt to prevent his fall as he was falling. As stated supra, Mr. Ferguson, who witnessed plaintiff's fall, stated that plaintiff tried to grab hold of something to prevent a fall. Thus, the Full Commission gives little weight to Dr. Freedman's opinion that plaintiff was unconscious as he fell, as the evidence of record supports that plaintiff was indeed conscious and tried to prevent his own fall.
22. The greater weight of the evidence of record establishes that plaintiff did not fall as the result of an unconscious collapse due to an idiopathic condition; rather, plaintiff's fall had its origin in the performance of his work duties. The Full Commission finds that at the time of his fall, plaintiff was within the orbit of his duty on defendant's premises, was engaged in the duties of his employment, and was exposed to the risks (i.e. falling) inherent in his work environment and related to his employment. Further, the Commission finds that the only active force involved was his exertions in the performance of his duties. Thus, plaintiff is entitled to an inference that his fall had its origin in the employment permitted.
23. By having an unexplained fall, plaintiff suffered an injury by accident arising out of and in the course of his employment.
24. In finding that plaintiff's fall constitutes an injury by accident, the Full Commission deems it appropriate to remand this matter to a deputy commissioner for the taking of additional evidence or further hearing, if necessary, and the entry of an Opinion and Award with findings on the issues of (1) the extent of plaintiff's disability; (2) the amount of indemnity benefits due plaintiff; (3) the extent of medical compensation due plaintiff, including attendant care; and (4) the determination of plaintiff's average weekly wage and resulting compensation rate.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. The Industrial Commission is the sole judge of the credibility of witnesses. Adams v. AVX Corp., 349 N.C. 676, 509 S.E.2d 411 (1998). In this case, the testimony and experiments of Dr. Saami Shaibani are found to lack credibility, and are thus given little weight. Further, the testimony of Dr. Freedman is also found to lack credibility because his opinions regarding plaintiff's level of consciousness during the fall are not based upon the evidence of record. Thus, there is insufficient evidence of record to show that plaintiff fell from an unconscious collapse due to an idiopathic condition.
2. North Carolina has adopted the "unexplained fall" rule. L. Jernigan, North Carolina Workers' Compensation Law and Practice § 5-7. Under the "unexplained fall" rule, if the cause of a fall while performing work-related duties is unknown, then courts will allow the inference of an accident arising out of the employment without requiring further proof.
 Our case law explains that where the facts indicate that at the time of an accident, an employee was within his orbit of duty on the business premises of the employer, [and] was engaged in the duties of his employment or some activity incident thereto, was exposed to the risks inherent in his work environment and related to his employment, and the only active force involved was the employee's exertions in the performance of his duties, an inference that the fall had its origin in the employment is permitted.
Hodges v. Equity Group, ___ N.C. App. ___, ___, 596 S.E.2d 31, 35 (2004) (internal quotations omitted) (even though plaintiff could not explain what cause him to fall, an inference that the fall had its origin in employment was permitted because plaintiff fell while walking to install a guard in a machine). In the present case, plaintiff was within the orbit of his duty on defendant's premises, was engaged in the duties of his employment, and was exposed to the risks (i.e. falling) inherent in his work environment and related to his employment. Further, that the only active force involved was his exertions in the performance of his duties. Thus, plaintiff is entitled to an inference that his fall had its origin in the employment permitted.
3. When the employee's idiopathic condition is the sole cause of the injury, the injury does not arise out of the employment. Hodges at 35. Thus, the "unexplained fall" rule does not apply if the fall is the result of an idiopathic condition. However, in the present case, there is insufficient evidence of record to show that plaintiff's fall was the result of an idiopathic condition.
4. The injury does arise out of the employment if the idiopathic condition of the employee combines with `risks attributable to the employment' to cause the injury. Hodges at 35. Thus, even if the Commission were to find in the alternative that plaintiff's fall was due in part to an idiopathic condition, plaintiff's injury would still be deemed to arise out of the employment because his idiopathic condition would have combined with risks attributable to the employment (i.e. the 8-inch raised platform) to cause the injury.
5. By having an unexplained fall, plaintiff suffered an injury by accident arising out of and in the course of his employment. N.C. Gen. Stat. § 97-2(6). Where any reasonable relationship to the employment exists, or employment is a contributory cause, the court is justified in upholding the award as `arising out of employment.' Hodges at 35.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 ORDER
1. This matter is hereby remanded to Chief Deputy Commissioner Stephen T. Gheen for assignment to a Deputy Commissioner for the taking of additional evidence or further hearing, if necessary, and the entry of an Opinion and Award with findings on the issues of (1) the extent of plaintiff's disability; (2) the amount of indemnity benefits due plaintiff; (3) the extent of medical compensation due plaintiff, including attendant care; and, (4) the determination of plaintiff's average weekly wage and resulting compensation rate.
2. Defendant shall pay costs.
This 7th day of December 2004.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
DISSENTING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER